**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHELLE HIGGINS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 17-cv-07637 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| LAKE COUNTY CIRCUIT COURT | ) | |
| CLERK'S OFFICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Michelle Higgins, Tiffany Deram, and Joshua Smothers—all former long-time employees of Defendant Lake County Circuit Court Clerk's Office ("Clerk's Office")—campaigned for incumbent Keith Brin during the 2016 election for Lake County Court Clerk. Brin lost. The new Court Clerk, Defendant Erin Cartwright Weinstein, fired Plaintiffs as one of her first acts in office. Plaintiffs assert that they were fired for supporting Brin over Weinstein, in violation of their First Amendment rights. Defendants now seek summary judgment pursuant to Federal Rule of Civil Procedure 56, contending that political loyalty was a valid job qualification for Higgins and Deram, all three Plaintiffs were fired for poor performance, and no Plaintiff is entitled to injunctive relief. (Dkt. No. 88.) For the reasons stated below, Defendants' motion is denied.

## BACKGROUND

### I.    Compliance with Local Rule 56.1

As a threshold matter, Defendants contend that Plaintiffs failed to comply with Local Rule 56.1 with their response to Defendants' statement of facts and Plaintiffs' statement of additional facts. (*See* Pls.' Resp. to Defs.' Rule 56.1 Statement of Uncontested Facts ("PRSOF"), Dkt. No.

104.) As relief, Defendants ask that Plaintiffs' filing be disregarded and certain of Defendants' facts deemed admitted.

In this District, a party moving for summary judgment must file a statement of material facts consisting of "concise numbered paragraphs" and supported by citations to "specific evidentiary material" attached as numbered exhibits; legal arguments are not allowed. N.D. Ill. R. 56.1(a)(2), 56.1(d). The same rules apply to a responding party filing a statement of additional facts in opposition to summary judgment. N.D. Ill. R. 56.1(b)(3), 56.1(d). A party's response to a statement of facts must attach evidentiary material, plainly assert, dispute, or admit and dispute in part each asserted fact, concisely explain the evidentiary support for disputes, and avoid legal argument (except appropriate objections). N.D. Ill. R. 56.1(e). Any fact not controverted by the opposing party's response may be deemed admitted. N.D. Ill. R. 56.1(e)(3); *see De v. City of Chicago*, 912 F. Supp. 2d 709, 714 (N.D. Ill. 2012).

Plaintiffs, here, certainly should have followed Local Rule 56.1 more closely. For example, they responded to one of Defendants' asserted facts with a nine-page narrative response—hardly a concise explanation of "how the cited material controverts the asserted fact" as required by Local Rule 56.1(e)(3). (*See* PRSOF ¶ 88.) Similarly, many of Plaintiffs' statements of additional facts are too long. (S*ee*, *e.g.*, Defs.' Resp. to Pls.' Local Rule 56.1(B)(3)(C) Statement of Additional Facts ("DRSOF") ¶¶ 2, 15, 53, Dkt. No. 109.) Viewed as a whole, however, the Court concludes that Plaintiffs' filings are adequate and need not be stricken. Where Plaintiffs have not adequately disputed Defendants' facts, those facts will be deemed admitted to the extent warranted by the supporting evidence. The Court will resolve issues regarding the admissibility of proffered evidence and whether material facts have been effectively disputed as those issues arise in the course of this opinion. The Court has taken care to consider only facts

that are admissible or "could later be presented in an admissible form." *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014); *see also* Fed. R. Civ. P. 56(c).

## II.    Undisputed Facts

The following facts are drawn from the parties' Local Rule 56.1 submissions and are undisputed.

Plaintiffs Higgins, Deram, and Smothers are former employees of the Clerk's Office. (PRSOF ¶¶ 3–5.) Defendant Weinstein is the Clerk of the Lake County Circuit Court.[1] (*Id.* ¶ 6.) Defendant Clerk's Office is a government entity under the State of Illinois's judicial branch. (*Id.* ¶ 7.) Defendant Lake County is a party to this case for indemnification purposes only. (Mem. Op. & Order at 11, Dkt. No. 54.)

Plaintiffs were at-will employees of the Clerk's Office. (PRSOF ¶¶ 12, 31, 51.) Higgins began working there in 1985, Deram in 1998, and Smothers in 2007. (*Id.*)  At the time of their terminations, Higgins was Department Chief of Criminal Division and the Branch Courts, Deram was Department Chief of Records, Small Claims, Civil Counter, the Criminal Traffic Counter, and Traffic Court Clerks, and Smothers was Supervisor of the Round Lake Beach branch and interim supervisor of the Records Department. (*Id.* ¶¶ 15, 37, 56; DRSOF ¶ 43.)

Weinstein defeated incumbent Brin in the 2016 election for Clerk of the Circuit Court of Lake County. (PRSOF ¶ 8.) On November 22, 2016, Weinstein met with Rodney Marion, Lake County's Director of Human Resources, to discuss the probable termination of Plaintiffs. (*Id.* ¶ 86.) Weinstein testified that she decided to terminate Plaintiffs one week later, on November 29, 2016, based on negative information she had acquired about them; however, Plaintiffs contend

---

[1] Weinstein was previously named in both her individual and official capacities. But the official capacity claim has been dismissed as duplicative of the claim against the Clerk's Office. (Mem. Op. & Order at 4–5, Dkt. No. 54.)

that Weinstein's explanations were pretextual and that their terminations were actually retaliatory. (*Id.* ¶ 87.) On December 1, 2016—Weinstein's first day in office—Plaintiffs each met separately with Weinstein and were given letters telling them that they had been placed on administrative leave and should return for a follow-up meeting the next day. (*Id.* ¶ 63.) On December 2, 2016, Plaintiffs were terminated. (*Id.*)

## DISCUSSION

Plaintiffs have one claim remaining in this case: that they were fired for supporting Brin over Weinstein for Court Clerk in violation of their First Amendment rights.[2] Pursuant to 42 U.S.C. § 1983, Plaintiffs seek damages against Weinstein in her individual capacity and injunctive relief against the Clerk's Office. Defendants seek summary judgment as to all Plaintiffs, as well as with respect to the request for injunctive relief.

Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A genuine dispute of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Inferences drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," but the nonmoving party must establish more than just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenish Radio Corp.*, 475 U.S. 574, 586–87 (1986).

---

[2] Plaintiffs' equal protection claim was previously dismissed by the Court (Mem. Op. & Order at 3–4), and they voluntarily dismissed their state-law claims. (Pls.' Notice of Voluntary Dismissal, Dkt. No. 35.)

Ultimately, "[s]ummary judgment is inappropriate when alternate inferences can be drawn from the available evidence." *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004).

## I. *Elrod-Branti* Exception

"The First Amendment generally prohibits government officials from dismissing or demoting an employee because of the employee's engagement in constitutionally protected political activity." *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1416 (2016). Although Defendants do not dispute that Plaintiffs' political support of Brin would generally be considered constitutionally protected speech, they nonetheless argue that Higgins and Deram held positions for which political loyalty is a valid job requirement and therefore their claim under the First Amendment for retaliation necessarily fails.

The *Elrod-Branti* exception to the general prohibition on termination based on political affiliation provides that "while public employers cannot condition employment on an individual's political affiliation, an employee's First Amendment right of political association leaves room for employers to dismiss employees in positions where political loyalty is a valid job qualification." *Bogart v. Vermilion County*, 909 F.3d 210, 213 (7th Cir. 2018) (citing *Branti v. Finkel*, 445 U.S. 507, 516 (1980); *Elrod v. Burns*, 427 U.S. 347, 372 (1976)). Party affiliation may be an appropriate requirement where "the job involves the making of policy and thus the exercise of political judgment or the provision of political advice to the elected superior, or because it is a job (such as speechwriting) that gives the holder access to his political superiors' confidential, politically sensitive thoughts." *Riley v. Blagojevich*, 425 F.3d 357, 359 (7th Cir. 2005) (citations omitted). Party affiliation, however, is not necessarily a valid requirement for all policymaking jobs. "The coach of a state university's football team formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats . . . the question is whether

the hiring authority can demonstrate that party affiliation is an appropriate requirement for [performing the job]." *Branti*, 445 U.S. at 518.

### A. Job Descriptions

The parties in this case agree that Higgins and Deram were Department Chiefs at the time of their terminations. Defendants, however, contend that Higgins and Deram officially held the positions of "Deputy Chief, Circuit Court" and that the associated job description shows that party affiliation was an appropriate requirement for their jobs. According to that job description, the Deputy Chief's responsibilities include to "[d]evelop procedures and protocol as changes require and train or relay information to staff," "[s]chedule staff, reassign staff as needed, discipline staff," and "[m]anage the daily activities in an assigned division/courtroom." (Defs.' Rule 56.1 Statement of Uncontested Facts ("DSOF"), Ex. 10, Position Description: Deputy Chief, Dkt. No. 92-10.) Plaintiffs respond that Defendants have not shown that this job description applied to Higgins and Deram, that Higgins and Deram are not familiar with the description, and that Higgins and Deram do not meet the qualifications for the description (neither have bachelor's degrees), all suggesting that the description was not actually used.

Generally, elected officials may rely on job descriptions to determine whether an employee falls under the *Elrod-Branti* exception, without a deeper examination of how the position functions in practice. *Riley*, 425 F.3d at 361 ("Incoming political leaders should be enabled to discover without protracted inquiry which jobs they can fill."). But officials must still demonstrate a connection between the job description and the corresponding employees. "[The] inquiry must focus on how the description was created; how it is updated and thus kept realistic rather than being allowed to drift far from the actual duties of the position; in short, on how reliable, how authoritative, the description is." *Id.*

Defendants have offered no evidence establishing that Higgins or Deram held the title of Deputy Chief. To the contrary, the parties agree that Higgins and Deram were ***Department*** Chiefs. Nowhere do Defendants offer support for the conclusion that the Deputy Chief job description corresponded to Higgins's or Deram's roles. And further, Defendants have not established any of the corroborating factors laid out in *Riley*, such as how the job description was created and updated. No evidence has been offered that the description was used for any purpose—let alone to define Higgins's or Deram's roles. On the other hand, the record provides a basis to find the descriptions unreliable. Both Higgins and Deram testified that they had never been given a copy of the descriptions and that they did not meet at least one of the listed job requirements: holding a bachelor's degree. (PRSOF ¶ 11.) While the Seventh Circuit in *Riley* concluded that a job description was reliable because it had been made and updated by a state agency and reviewed by the state's Civil Service Commission, Defendants here have not established anything about how the Deputy Chief position was created, reviewed, and implemented. *Riley*, 425 F.3d at 361–62.

Because there is a genuine dispute of material fact as to whether their job descriptions establish that Higgins and Deram fell under the *Elrod-Branti* exception, Defendants are not entitled to summary judgment on that basis.

### B.    Job Responsibilities

Defendants next contend that political affiliation was a valid job requirement for Higgins and Deram because of their responsibilities.

As Department Chief, Higgins supervised several divisions within the Clerk's Office, including the Branch Courts, the Criminal Court Clerks, and the Civil Court Clerks (Law and Chancery). (PRSOF ¶ 16.) She was also regarded as "fresh eyes" in the Traffic Branch Courts,

charged with making recommendations and reporting issues to improve service to the public. (*Id.*) Higgins supervised around 70 people (including seven supervisors reporting directly to her) and provided input on, reviewed, and signed off on their evaluations, consulting confidential personnel files to do so. (*Id.* ¶¶ 18, 21.) Higgins made recommendations for employee discipline, which were typically accepted by her bosses; she believed that they trusted her judgment regarding personnel issues. (*Id.* ¶¶ 22, 23.) She also helped implement a new policy and procedure for managing the Clerk's Office's evidence room. (*Id.* ¶ 20.)

Deram had similar supervisory responsibilities. For example, she oversaw several departments within the Clerk's Office, supervising around 60 employees including supervisors and assistant supervisors. (*Id.* ¶¶ 37, 40.) She also consulted on developing new protocols for the evidence room and worked with Brin to launch a new E-Filing division. (*Id.* ¶¶ 41, 43.) Deram consulted with stakeholders like the Lake County State's Attorney's Office and the Administrative Office of Illinois Courts to provide recommendations to her bosses. (*Id.* ¶ 42.) And like Higgins, Deram believed that she was trusted by her bosses to carry out procedures at their request. (*Id.* ¶ 39.)

Yet Weinstein testified that she did not believe that political affiliation was a requirement for effective job performance for Deram's or Higgins's replacements. (DSOF, Ex. 5, Weinstein Dep. 60:4–61:8, Dkt. No. 92-5.) She also testified that their replacements do not create policy, although she attributed it to union contract requirements. (*Id.* at 64:2–22.) Further, Higgins and Deram were at least two levels below the Clerk in the office hierarchy—there is a "Chief Deputy" position above them. (DSOF, Ex. 2, Higgins Dep. 32:15–33:3, 34:5–19, Dkt. No. 92-2.) Deram also testified that the Clerk's Office's policies were created by others, including the Clerk and the Chief Deputy but also the Administrative Office of Illinois Courts, the State's Attorney's Office,

and others. (DSOF, Ex. 3, Deram Dep. 165:17–171:12, Dkt. No. 92-3.)[3] While Higgins and Deram clearly exercised meaningful discretion in their jobs, which involved supervising dozens of employees at multiple levels of authority and managing multiple divisions of the Clerk's Office, the mere exercise of discretion does not make political affiliation a job requirement. *See Riley*, 425 F.3d at 359 ("Above the lowest levels of the civil service the question is not discretion or no discretion but less or more, and in such cases drawing a line is inescapably arbitrary . . . .").

Defendants have the burden of establishing that the *Elrod-Branti* exception applies. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 354 (7th Cir. 2005). Here, however, the record reveals a question of fact as to whether Higgins and Deram exercised the kind of discretion and policymaking authority that would make political affiliation a requirement for their jobs. While they played roles in significant initiatives at the Clerk's Office, like creating new procedures for the evidence room and launching a new division for E-Filing, a reasonable jury could nonetheless conclude that policy decisions were made multiple levels above them. In short, there is a disputed issue of material fact as to whether Higgins and Deram wielded significant discretion to implement the Clerk's goals or exercised authority within the narrow confines of policies set by others. Thus, the Court cannot find as a matter of law that Higgins and Deram were subject to the *Elrod-Branti* exception based on their responsibilities.

---

[3] Defendants object that it mischaracterizes Deram's testimony to state that the Clerk's Office's policies were created by people with higher authority than the Department Chiefs. But Deram testified as much, stating: "[A]ny other policy that was developed within the [Clerk's Office] . . . for the most part, it's all written up for us. AOIC [Administrative Office of the Illinois Courts] standards tell us what we have to follow. Statute tells us what we have to follow. The State's Attorney's Office tells us and consulted with us on what we had to follow . . . . [F]or the most part every policy that the Circuit Clerk's Office follows was written and adapted by somebody of much higher authority than me." (Deram Dep. 166:10–18; 167:6–9.)

## II. *Prima Facie* **Case**

To establish a *prima facie* case of political retaliation, Plaintiffs must show that "(1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech was at least a motivating factor in the employer's actions." *Yahnke v. Kane County*, 823 F.3d 1066, 1070 (7th Cir. 2016). Focusing on the third element, to establish that their protected speech was a motivating factor in their terminations, Plaintiffs must "demonstrate a causal connection between the conduct [their protected speech] and the employer's action." *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019). "As a threshold matter, the plaintiff must show that the defendant was aware of the protected conduct." *Id.* When the employer's action "follows on the close heels of protected expression," suspicious timing alone can establish a causal connection, although "this is a context-specific analysis with no formal legal rule." *Id.* Otherwise, Plaintiffs may offer other evidence to establish a causal connection. *Id.*

The first question, then, is whether Plaintiffs have adduced sufficient evidence that Weinstein was aware of their political support for Brin. Weinstein testified at her deposition that during her campaign, she did not know Higgins (or even what Higgins looked like) and she did not know Smothers worked on Brin's campaign. (Weinstein Dep. 43:3–8, 46:1–3, 85:21–24.) But Weinstein also testified that she expected that Higgins and Deram would be supporting Brin, as he was their boss, and that she would not have been surprised if Smothers supported Brin. (*Id.* at 61:17–20, 62:20–63:6.) Further, Deram testified that Weinstein saw her and her co-Plaintiffs at campaign events and that Weinstein's husband "had a great time calling us out and yelling derogatory comments at us or calling us fakes and liars . . . [Weinstein] was always in tow right behind him." (Deram Dep. 100:7–102:13.)

Deram also testified about a dramatic encounter at the Highwood Pumpkin Fest, where he recalls that Weinstein's husband "stood in front of our table and called us all [various expletives]."[4] (*Id.* at 102:10–11.) Similarly, Higgins testified that she walked in parades and attended numerous campaign events on behalf of Brin, where she wore a Brin t-shirt and was seen by Weinstein, her husband, and other Weinstein supporters, including Donna Hamm, who is now the office's Chief Deputy. (Higgins Dep. 68:15–19, 69:2–72:15.) Higgins also knew Weinstein's husband and had previously had numerous conversations with him when she was a criminal court clerk and he was a criminal defense attorney. (*Id.* at 95:23–96:11.) Additionally, Smothers testified that at a Fourth of July parade event in which Smothers marched with Brin, Weinstein's group was immediately ahead of them, "back to back." (DSOF, Ex. 4, Smothers Dep. 109:2–11, Dkt. No. 92-4.) Smothers also testified that he had "direct prolonged eye contact" with Weinstein at a Rib Fest event. (*Id.* at 110:9–111:1.) And finally, Weinstein testified that she saw Smothers at the Clerk's Office prior to her election, not working but instead wandering around carrying a cup of coffee and socializing. (Weinstein Dep. 50:19–52:4.)

Plaintiffs' evidence would allow a reasonable jury to conclude that Weinstein knew that Plaintiffs had supported Brin. The Court cannot resolve the credibility issue of whose testimony to believe at the summary judgment stage. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."). Accordingly, there is a disputed issue of fact.

---

[4] Defendants object that Deram's testimony regarding what Weinstein's husband said is hearsay. They are mistaken. Hearsay is a statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Plaintiffs do not assert that Weinstein's husband's derogatory remarks about them were true; rather, they argue that what he said—while Weinstein looked on—allows for an inference that Weinstein knew who Plaintiffs were and that they supported Brin.

With respect to the purportedly suspicious timing of their terminations, it is undisputed that Weinstein terminated Plaintiffs as one of her very first acts in office. She made the decision to terminate them before taking office and set their firing in motion, causing Plaintiffs to be locked out of their computers at 12:01 a.m. on the first day of her administration. (DRSOF ¶ 13.) Weinstein suspended Plaintiffs approximately one hour after she was sworn in, asking them to collect their belongings and leave the office. (*Id.*) Further, the record does not contain any evidence of a "significant intervening event" interrupting the suspicious timing between Plaintiffs' political activity and their termination. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012). In such circumstances, the termination of government employees who opposed (or failed to support) the reelection of an elected official can establish causation for purposes of a *prima facie* case of retaliatory political termination. *See Coen v. Coffelt*, No. 09 C 2049, 2011 WL 1303340, at *9 (N.D. Ill. Mar. 31, 2011); *Foster v. DeLuca*, No. 04 C 5850, 2006 WL 1980197, at *6 (N.D. Ill. July 7, 2006). For purposes of establishing causation based on suspicious timing, the Seventh Circuit "typically allow[s] no more than a few days to elapse between the protected activity and the adverse action." *Kidwell*, 679 F.3d at 966. However, the analysis is context-specific with no formal legal rule. Because Weinstein terminated Plaintiffs as soon as she could and Plaintiffs have presented evidence that Weinstein was aware that they supported Brin against her in the election, Plaintiffs have made a sufficient showing to establish a *prima facie* case.[5]

Moreover, beyond the suspicious timing, Plaintiffs have offered other evidence that their speech motivated Weinstein's decision to terminate them. For one, Weinstein did not review Plaintiffs' personnel records before firing them. (Weinstein Dep. 84:18–85:4.) She also stated in

---

[5] This case is distinguishable from cases like *Daza*, 941 F.3d at 309–10, where the Seventh Circuit affirmed summary judgment against a plaintiff who did not present sufficient evidence of suspicious timing or knowledge of protected conduct by the relevant officials. Here, Plaintiffs have presented evidence of both suspicious timing and knowledge of protected conduct.

her verified answers to interrogatories that Plaintiffs were terminated because they were not meeting the job expectations of the new administration; but they never had an opportunity to do so because Weinstein decided to terminate them two days before she started as Clerk. (DSOF, Ex. 11, Interrog. Answers ¶¶ 1–2, Dkt. No. 92-11.) And, as discussed below, a reasonable jury could question some of Weinstein's explanations for her decision to fire Plaintiffs. This evidence solidifies the disputed issue of fact with respect to whether their political support for her opponent was a motivating factor in Weinstein's decision to terminate Plaintiffs.

### III.  *Mt. Healthy* **Analysis**

Because Plaintiffs have established a *prima facie* case of retaliation, the burden shifts to Defendants to demonstrate that Weinstein would have fired Plaintiffs even if they had not supported Brin. *Yahnke*, 823 F.3d at 1071 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *Greene v. Doruff,* 660 F.3d 975, 980 (7th Cir. 2011) ("[T]he plaintiff must show only that the defendant's conduct was a sufficient condition of the plaintiff's injury. The defendant can rebut, but only by showing that [the plaintiff's] conduct was not a necessary condition of the harm—the harm would have occurred anyway."). The key question is whether "taking all the facts and reasonable inferences in [Plaintiffs'] favor, there can be no reasonable dispute" that Plaintiffs would have been fired despite their "protected First Amendment activity." *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012).

"Once a defendant produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* To do so, Plaintiffs "must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Id.* (citations omitted.) Put another way, "summary

judgment should be granted when, in light of the defendant's unrebutted evidence, the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's [non-retaliatory explanation]." *Massey v. Johnson*, 457 F.3d 711, 719 (7th Cir. 2006) (internal quotation marks and citation omitted).

Weinstein testified about her reasons for terminating Plaintiffs at her deposition. She explained that she terminated Higgins because she "constantly" berated and yelled at staff, had temper tantrums, left work undone, had two prior arrests and adjudications for driving under the influence ("DUI"), caused morale issues, and was criticized by judges. (PRSOF ¶ 74.) Weinstein further testified that she terminated Deram because clerks were upset that they were monitored by video cameras feeding to Deram's laptop, she had been removed from the domestic violence courtroom because she had conflicts with the judge there and kept making mistakes, she degraded clerks, and she used an obscenity to refer to a judge. (*Id.* ¶ 75.) Weinstein also claimed that an employee who was a clerk and union representative told her that employees would quit unless Higgins and Deram were fired (*id.* ¶ 78), and she terminated Smothers in part because she had observed him wandering around carrying a cup of coffee and socializing instead of working (*id.* ¶ 76). Also, according to Weinstein, Clerk's Office staff told her Smothers was unfriendly and frustrating and did not understand his job; and further, Weinstein wanted to make changes with supervisors and restructure the office and eliminated the position of interim file supervisor (*Id.* ¶ 77.)

While Plaintiffs testified that Weinstein told them at their respective suspension and termination meetings that she was restructuring and making changes in the Clerk's Office, the record does not indicate that Weinstein shared her other purported reasons with them. (*Id.* ¶¶ 64–66.) In restructuring the office, Higgins's and Deram's Department Chief positions were divided

across three new Department Chief roles; Smothers's position as Supervisor of the Round Lake Beach branch continued, though his position of interim records supervisor was eliminated. (*Id.* ¶ 89; Weinstein Dep. 58:22–59:6.)

The Court concludes that Weinstein has presented evidence that she would have fired Plaintiffs even if they had not supported Brin. Weinstein testified that she gathered evidence from multiple sources—including Clerk's Office staff, judges, and her personal observations as a practicing attorney who interacted with the Clerk's Office—leading her to conclude that Plaintiffs were not suitable for the positions she sought to fill in her restructuring of the office.[6] Not every reason Weinstein has given, standing on its own, would support a nonretaliatory motive for firing Plaintiffs. But the record viewed as a while includes sufficient evidence of nonretaliatory reasons for terminating Plaintiffs to shift the burden back to them to show that those reasons are pretextual.

So the Court next considers whether a reasonable jury could reject Weinstein's non-retaliatory explanations based on the record. Generally, "[a] reorganization is a legitimate reason to terminate someone who is performing satisfactorily." *Nelms v. Modisett*, 153 F.3d 815, 821 (7th Cir. 1998) (internal quotation marks omitted). Any other basis may also suffice, so long as it was a true and sufficient reason for Weinstein's actions. "An employer's reasons for firing an employee can be foolish or trivial or even baseless, as long as they are honestly believed." *Lord v.*

---

[6] The Court does not find that Plaintiffs have admitted to the conduct that formed the purported bases for their terminations. For example, while Defendants argue that Smothers has admitted he was "not surprised" there were complaints about him standing around and not helping employees, Smothers further explained that the reason he was not surprised was because staff always complained about their supervisors and he would be surprised to hear such a complaint from the general public. (PRSOF ¶ 57.) While Deram testified that there was a judge who, prior to 2007, preferred not to work with her, she did not admit having any recent issues working with judges that affected her performance at the time of her termination. (*Id.* ¶ 33.) And Higgins did not testify that she has an alcohol problem, as Defendants assert; instead, she testified that she resolved her alcohol problems in the early 1990s and has not faced DUI charges since. (Higgins Dep. 116:4–9; 176:15–20.)

*High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (internal quotation marks omitted).

Plaintiffs have pointed to more than enough evidence to create a genuine issue of fact as to whether the nonretaliatory reasons offered for their terminations were, in fact, the true reasons as opposed to mere pretext. For example, Deram was replaced by her former supervisee, Kandace Wells, who was on probation at the time she took over Deram's role. (Deram Dep. 154:6–155:23.) Deram testified that she saw Wells supporting Weinstein at campaign events. (Higgins Dep. at 120:22–121:10.) Similarly, Higgins was replaced by Cindy Robers, another Weinstein supporter. (*Id.*; Weinstein Dep. 42:13–43:2.) Deram testified that both Robers and Wells pointed and laughed at Plaintiffs during Weinstein's swearing-in ceremony. (Deram Dep. 83:13–84:17.)

Additionally, certain of the explanations Weinstein gave for dismissing Plaintiffs are shaky enough that a jury could discredit them at trial and decide to disbelieve Weinstein's account. For example, the official reason for dismissing Smothers was a "reduction in work force." (DRSOF ¶ 38.) But the Clerk's Office promoted another employee to Smothers's former role as supervisor of the Round Lake Beach branch. (Weinstein Dep. 54:9–11; 58:22–59:6.) Similarly, Weinstein claimed that Higgins could not continue as a supervisor because of two DUIs—one in the 1980s and one in the early 1990s. (DRSOF ¶ 30.) But although Weinstein testified that she believed it was inappropriate for Department Chiefs to have DUIs and that the court administrator would not give security badges to staff with DUIs, she did not explain how Higgins's decades-old DUIs had impaired her performance or would do so in the future,

especially considering that Higgins had worked at the Clerk's Office for 31 years. (PRSOF ¶¶ 79–80.)[7]

There are other gaps in Weinstein's testimony as well. For example, Weinstein stated that she terminated Deram, in part, because there were six video cameras above the clerks' desks that led to Deram's laptop. (Weinstein Dep. 77:13–23.) She elaborated that court security was not monitoring those cameras and that "facilities stated that they did not have any part in putting those cameras in," so staff felt like they were being spied on. (*Id.* at 77:24–78:6.) But Weinstein did not say that she learned that Deram was responsible for installing the cameras or the surveillance program; as far as she knew (on the record before the Court), the scheme was implemented by Deram's supervisor. Notably, the only official, contemporaneous document explaining the reasons for Higgins's and Deram's terminations gave the reason as "attitude." (DRSOF ¶¶ 17, 27.) *See Silva v. Wisconsin*, 917 F.3d 546, 563 (7th Cir. 2019) (in context of Title VII case, "evolving explanations support an inference of pretext").

Finally, Weinstein could not recall firing anyone who supported her in her campaign—although she acknowledged that she demoted one such employee "maybe a year after" taking office. (DRSOF ¶ 14.) Weinstein did not review Plaintiffs' personnel files or speak with Plaintiffs about their performances before deciding to fire them. (PRSOF ¶¶ 24, 81; DRSOF ¶ 54.) The record supports the conclusion that Weinstein generally collected information from the faction within the Clerks' Office that supported her. These facts, combined with evidence indicating that Weinstein knew that Plaintiffs supported Brin and that Weinstein terminated Plaintiffs as one of

---

[7] Weinstein also testified that she had been told that Higgins had continuing substance abuse issues and that those issues contributed to the "totality of the circumstances" in deciding to terminate Higgins. (Weinstein Dep. 72:1–16; 97:24–98:9.)

17

her first acts in office, provide evidence on which a jury could decide to discredit Weinstein's explanation.

Put simply, Plaintiffs have provided enough evidence of pretext to survive summary judgment. Construing the admissible evidence in the record in the light most favorable to Plaintiffs, Defendants cannot prevail as a matter of law.

### IV. Injunctive Relief

As a final issue, Defendants contend that Plaintiffs lack standing to demand that the Clerk's Office change its policies because they no longer work there and have not sought reinstatement.[8] Plaintiffs concede that they do not explicitly seek reinstatement in their complaint, but argue that they should be allowed to seek reinstatement as a remedy because it is among the remedies available to them. Plaintiffs go on to assert that they have standing to challenge the Clerk's Office's policies if they are granted reinstatement.

Standing is an essential component of Article III's limitation of federal courts' judicial power only to cases or controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). There are three elements that constitute the "irreducible constitutional minimum" of standing. *Lujan*, 504 U.S. at 560. A "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

---

[8] Defendants also argue that Plaintiffs' claims were mooted by their dismissal from the Clerk's Office. *See Powell v. McCormack*, 395 U.S. 486, 496–97 (1969); *see also St. John's United Church of Christ v. City of Chicago*, 502 F. 3d 616, 626 (7th Cir. 2007) (plaintiffs must maintain personal interest in litigation for its entire duration). But Defendants' position is that Plaintiffs have lacked standing to pursue injunctive relief for the duration of the suit, not that some intervening event mooted their claims. Thus, their discussion of mootness becomes duplicative of their argument regarding standing.

decision." *Spokeo*, 136 S. Ct. at 1547. In seeking injunctive relief, Plaintiffs must demonstrate "immediate danger of sustaining some direct injury." *Hirst v. Skywest, Inc.*, No. 15 C 02036, 2016 WL 2986978, at *14 (N.D. Ill. May 24, 2016) (quoting *Felt v. Ward*, 886 F. 2d 848, 857 (7th Cir. 1989)). The Court may grant injunctive relief at its discretion "in the extraordinary situations where legal remedies such as monetary damages are inadequate." *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 842 (7th Cir. 2005).

In their complaint, Plaintiffs seek a permanent injunction against Defendants to prevent them from committing further constitutional violations by taking adverse actions against employees (including Plaintiffs) because of their support for a political candidate; a permanent injunction "requiring that the Defendants adopt employment practices and policies in accord and conformity with the requirements of the Civil Rights Act of 1871, 42 U.S.C. § 1983;" and a declaration that Defendants' actions violated the First Amendment. (Compl. at 19, Dkt. No. 1.) They also seek "such other relief as the Court may deem just, equitable and appropriate." (*Id.* at 20.) Plaintiffs argue that this last request leaves the door open to pursue reinstatement, which gives them a continuing stake in the Clerk's Office's policies.[9]

Federal Rule of Civil Procedure 8(a)(3) requires Plaintiffs to include in their complaint "a demand for the relief sought, which may include relief in the alternative or different types of relief." In other contexts, courts in the Seventh Circuit have held that it is enough for plaintiffs to demand equitable relief broadly, without further specifying the form that the relief will take. *See Albert v. Trans Union Corp.*, 346 F.3d 734, 739 (7th Cir. 2003) (demand for "all appropriate relief for unjust enrichment under the laws of the states in which Plaintiffs reside" constituted demand for injunctive relief); *Kauffman v. Gen. Elec. Co.*, No. 14-CV-1358, 2015 WL 3562577,

---

[9] Defendants do not challenge that Plaintiffs would have standing to challenge the Clerk's Office's policies if reinstated.

at *2 n.3 (E.D. Wis. June 5, 2015) (at motion to dismiss stage, demand for "such other relief as may be appropriate" constituted demand for equitable relief). Because "plaintiffs are not required to plead legal theories," the Court has discretion to allow Plaintiffs to raise new legal theories at the summary judgment stage. *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014) (quoting *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 909 (7th Cir. 2012) (*en banc*)). The Court concludes that Plaintiffs here may pursue available equitable relief, including reinstatement and (if they succeed in reinstatement) changes to the Clerk's Office's policies.

If Plaintiffs are not reinstated, they may lack standing to obtain an injunction. But the Court finds no reason to preclude them from seeking reinstatement, and Defendants have not identified contrary authority. For example, they cite *Brown v. County of Cook*, 549 F. Supp. 2d 1026, 1032 & n.7 (N.D. Ill. 2008), but that case held that a former employee lacked standing to enjoin the policies of a sheriff's office because (1) the employee had retired; and (2) the Sheriff who committed the alleged wrongdoings had left the office, defeating any claim the plaintiff might have held to fear future harm. Defendants also cite *Hines v. Wild*, No. 07 C 50205, 2013 WL 3755418, at *6 (N.D. Ill. July 12, 2013), for the proposition that a plaintiff may not raise new requests for relief in response to a motion for summary judgment. However, *Hines* held that the plaintiff could not assert a new ***claim*** at the summary judgment stage, not that a plaintiff could not request alternative remedies. *Id.* at *6 n.1.

Defendants also have not established that they will be prejudiced if Plaintiffs are permitted to seek reinstatement. It is too late for Plaintiffs to alter the factual basis of their complaint. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F. 3d 852, 859 (7th Cir. 2017). The Court may deny Plaintiffs the opportunity to add last-minute claims or revise the factual basis of the complaint because such amendments may "substantially alter the course of trial or effectively

deny [the opposing party] the opportunity . . . to take discovery." *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 750 (7th Cir. 2015). But here the legal theory is the same and the underlying facts are the same; the only difference is the form of relief. Defendants have long known that Plaintiffs sought injunctive relief against the Clerk's Office—the Court previously dismissed Plaintiffs' claims for damages against the Clerk's Office while allowing their claims for injunctive relief to proceed. (Mem. Op. & Order at 5.) So the Court will allow Plaintiffs to pursue reinstatement and other injunctive relief against the Clerk's Office.

## CONCLUSION

For the above reasons, Defendants' motion for summary judgment (Dkt. No. 88) is denied.

ENTERED:

Dated: September 15, 2021

_____
Andrea R. Wood
United States District Judge