# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE HIGGINS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 17-cv-07637 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| THE LAKE COUNTY CIRCUIT COURT | ) | |
| CLERK'S OFFICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Erin Cartwright Weinstein ("Weinstein"), the Lake County Circuit Court Clerk, terminated Plaintiffs Michelle Higgins, Tiffany Deram, and Joshua Smothers—all employees of Defendant Lake County Circuit Court Clerk's Office ("Clerk's Office")—after defeating then-incumbent Keith Brin during the 2016 election and assuming office. Plaintiffs subsequently sued Weinstein, the Clerk's Office, and Lake County under 42 U.S.C. § 1983, claiming that they were terminated for supporting Brin over Weinstein, in violation of their First Amendment rights to free association. Weinstein denied those allegations. A jury ultimately returned verdicts in favor of Plaintiffs against Weinstein and awarded them compensatory and punitive damages. Now before the Court is Weinstein and the Clerk's Office's post-trial motion to alter or amend the judgment and for a new trial. (Dkt. No. 222.) For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

The trial began with *voir dire* on November 17, 2022, during which the Court empaneled nine jurors out of thirty-four prospective jurors. Over the course of the ten-day jury trial, Plaintiffs called nine witnesses: (1) Higgins, the former Department Chief of Criminal and Branch Courts at

the Clerk's Office; (2) Deram, the former Department Chief of Records, Small Claims, Civil Counter, Criminal Traffic Counter, Traffic Court Clerks, and General Divisions at the Clerk's Office; (3) Smothers, the former Supervisor of the Round Lake Beach Branch Court and interim supervisor of the Records Department at the Clerk's Office; (4) Beth Janicki-Clark, the general counsel of the Illinois Municipal Retirement Fund ("IMRF"); (5) Weinstein, the Lake County Circuit Court Clerk; (6) Donna Hamm, the Chief Deputy at the Clerk's Office; (7) Cynthia Robers, the Department Chief of Criminal Records and Traffic Division at the Clerk's Office; (8) Kandace Wells, the Department Chief of the Civil Division; and (9) Jacqueline Hampton, the Supervisor of the Civil Division at the Clerk's Office.

Weinstein, in turn, called five witnesses: (1) David Weinstein ("David"), Weinstein's husband and a participant in her 2016 campaign; (2) Christina Narbone, the court services specialist at the Clerk's Office; (3) Rodney Marion, the former Director of Human Resources for Lake County; (4) Richard Margolin, M.D., Higgins's former physician; and (5) Weinstein herself. Further, the parties presented the jury with over forty exhibits, including employment records, medical records, photographs, and social media posts. The following summarizes the trial evidence.[1]

Higgins, Deram, and Smothers are former employees of the Clerk's Office. The Clerk's Office had the following organizational structure: (1) circuit court clerk, (2) chief deputy, (3)

---

[1] In their post-trial motion, Weinstein and the Clerk's Office do not challenge the jury's determination that Plaintiffs proved by a preponderance of the evidence (1) Plaintiffs supported Brin's campaign for political office, (2) Weinstein intentionally terminated Plaintiffs' employment, (3) Weinstein's belief that Plaintiffs supported Brin's campaign for political office was a reason that Weinstein terminated Plaintiffs' employment, and (4) Weinstein's termination of Plaintiffs' employment would be likely to deter an ordinary employee in Plaintiffs' circumstances from supporting Brin's campaign for political office. Instead, they contest the jury's award of back pay and lost pension benefits, the jury's determination that Weinstein did not prove by a preponderance of the evidence that political affiliation was an appropriate requirement for Higgins's and Deram's positions at the Clerk's Office, and alleged errors in the jury selection process. Accordingly, the Court focuses here on the evidence relevant to those issues.

department chiefs, (4) supervisors, and (5) court clerks. Higgins, who had worked in various positions at the Clerk's Office for thirty-one years, was the Department Chief of Criminal and Branch Courts. Her duties as Department Chief included supervising approximately seventy employees, providing input on employee personnel evaluations, balancing the financials of the branch courts, meeting with the judiciary regarding new procedures that the judiciary wanted to implement, making recommendations for procedural changes within the Clerk's Office, and participating in meetings about a new evidence room for the Clerk's Office. Nonetheless, Higgins denied that she created policy for the Clerk's Office; rather, she testified that then-Lake County Circuit Court Clerk Brin and then-Chief Deputy Jeanne Polydoris were responsible for policymaking at the Clerk's Office. According to Higgins, she merely carried out the policies that Brin and Polydoris created.

Deram, who had worked in several positions at the Clerk's Office for eighteen years, was the Department Chief of Records, Small Claims, Civil Counter, Criminal Traffic Counter, Traffic Court Clerks, and General Divisions. Deram's responsibilities as Department Chief included overseeing case records, ensuring that the Clerk's Office followed local and state rules, supervising approximately sixty employees, assisting with the development and implementation of the evidence protocol,[2] working with Brin on the e-filing project, and consulting with the Lake County State's Attorney's Office and Administrative Office of Illinois Courts ("AOIC") for guidance.

Smothers, who had worked in different positions at the Clerk's Office for approximately ten years, was the Supervisor of the Round Lake Beach Branch Court and interim supervisor of

---

[2] According to Deram, the evidence protocol was a protocol for the Clerk's Office's handling of evidence in the evidence room.

the Records Department. In his role as supervisor, Smothers oversaw the records department, scheduled staff, assisted with accounting issues, and supplied his staff with necessary resources to succeed at their jobs.

In 2016, Higgins, Deram, and Smothers campaigned for incumbent Brin in the election for Lake County Circuit Court Clerk. Brin ran as the Republican Party candidate against Weinstein, the Democratic Party candidate. Two of Weinstein's goals for improving the Clerk's Office were to address issues with the evidence room and e-filing systems under the Brin administration. Weinstein ultimately defeated Brin in November 2016. On November 22, 2016, Weinstein met with Marion to discuss her plans to terminate Plaintiffs. According to Weinstein, she had received negative reports about Plaintiffs from judges and Clerk's Office staff. Weinstein assumed office on December 1, 2016, and she placed Plaintiffs on administrative leave that same day. She then terminated Plaintiffs on December 2, 2016.

Weinstein denied terminating Plaintiffs due to their support of Brin's campaign. As to Higgins, Weinstein testified that she terminated Higgins because of her attitude, her failure to meet the job expectations of the new administration, and her prior convictions for driving under the influence ("DUI"). Similarly, Weinstein testified that she terminated Deram because of her attitude and inability to meet the job expectations of the new administration; specifically, Weinstein testified that Deram had negative interactions with judges and invaded the privacy of her employees. As to Smothers, Weinstein asserted that she terminated him because of a reduction in workforce and his failure to meet the job expectations of the new administration due to his poor work ethic and ineffectiveness at performing his duties. Moreover, Weinstein testified that she would have terminated Smothers for his 2007 DUI conviction, which she discovered a few weeks prior to trial. For their part, Plaintiffs testified that Weinstein's proffered reasons for terminating

4

them were false, as demonstrated by their recent positive performance evaluations and the fact that they had never worked for Weinstein's administration.

Weinstein subsequently promoted Robers and Wells to replace Higgins and Deram, respectively. Weinstein testified that she did not believe that political affiliation was a requirement for effective job performance for the department chief position. And she also stated that while her department chiefs do not create policy, they work on policy with her and provide input into her decisionmaking.

With respect to their damages for lost wages, Plaintiffs offered into evidence their W-2 forms from subsequent jobs after their termination from the Clerk's Office. They also testified about their annual earnings at the Clerk's Office in 2016: Higgins's annual salary was $101,000, Deram's annual salary was $76,000, and Smothers's annual salary was $54,000. Plaintiffs also introduced into evidence pension estimate records from the IMRF, which listed their annual wage history with the Clerk's Office from 2006 through 2016. According to Janicki-Clark, employers, such as the Clerk's Office, report their employee's payroll information to the IMRF monthly. Janicki-Clark further testified that the IMRF pension estimate records do not reflect Plaintiffs' wages following their termination from the Clerk's Office, nor do they calculate Plaintiffs' lost wages. She also admitted that the IMRF did not seek additional information from the Clerk's Office regarding the wages for Plaintiffs' positions after Plaintiffs' termination in December 2016; instead, the IMRF pension benefits assume that the participant would continue to receive the same salary as their last reported salary.

On the other hand, Weinstein testified that she changed the Department Chief position from a M-9 grade position to an M-8 grade position in order to afford hiring an additional Department Chief. Consequently, the Department Chief's annual salary decreased to a range of

$63,800 to $97,000. Lake County employment records show that the new Department Chiefs, Robers and Wells, received approximately $65,000 annually.

With respect to IMRF pension benefits, Janicki-Clark testified that those benefits are determined by a formula set forth in an Illinois statute. Among other things, this formula accounts for an individual's final rate of earnings and the number of years that they worked in an IMRF-eligible position. Upon a participant's request, an IMRF analyst performs pension benefit estimates using the IMRF's pension administration system, which is designed to apply the statutory formula. The analyst also inputs the participants' requested assumptions; thereafter, the system generates a report based on the statutory formula and inputs.

During the litigation, Plaintiffs sent letters to the IMRF, requesting that the IMRF perform pension benefit estimates, including calculating the actual, vested value of Plaintiffs' pensions at the age of 55 and the hypothetical value of Plaintiffs' pensions if they had worked at the Clerk's Office until the age of 55. According to Janicki-Clark, the IMRF produced Plaintiffs' records in 2019. Plaintiffs then introduced those records into evidence. But Janicki-Clark did not recall whether the pension administration system's calculation of the pension value evaluated the life expectancy of each Plaintiff. And she admitted that the IMRF estimates did not include a calculation of the present value of pension benefits.

Both Deram and Smothers testified about the present value of their lost pension benefits and how they performed the present value calculations using formulas from the Internet and information from the U.S. Treasury Department's website. As to Higgins, she testified that she began collecting her pension when she retired at 55 in 2021. Higgins did not perform a present value calculation at trial.

At the close of Plaintiffs' case-in-chief, Weinstein orally moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) with respect to Higgins's and Deram's claims against her. The Court denied the motion. Subsequently, on December 2, 2022, a jury found Weinstein liable with respect to Plaintiffs' First Amendment political affiliation claims. The jury awarded Higgins $1,034,467 in total compensatory damages, including $50,000 for physical and mental and emotional pain and suffering, $391,467 in lost wages and salary, and $593,000 for the present value of lost benefits. As to Deram, the jury awarded her $937,908 in total compensatory damages, including $25,000 for physical and mental and emotional pain and suffering, $188,704 in lost wages and salary, and $724,204 for the present value of lost benefits. With respect to Smothers, the jury awarded him $467,123 in total compensatory damages, including $25,000 in physical and mental and emotional pain and suffering, $214,053 in lost wages and salary, and $228,070 for the present value of lost benefits. Additionally, the jury awarded each Plaintiff $75,000 in punitive damages.

## DISCUSSION

Weinstein and the Clerk's Office (collectively, "Defendants") have filed the instant post-trial motion under Federal Rules of Civil Procedure 50(b), 59(a), and 59(e).

Defendants first renew Weinstein's motion for judgment as a matter of law pursuant to Rule 50(b) as to Higgins and Deram. In deciding a Rule 50(b) motion, the Court must "construe the trial evidence strictly in favor of the party who prevailed before the jury" and determine "whether a reasonable jury would have a legally sufficient evidentiary basis to find for the party on that issue." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 821 (7th Cir. 2016) (internal quotation marks and citations omitted). Yet the Court must "not make credibility determinations or weigh the evidence. Although the Court reviews the entire record,

7

the court must disregard all evidence favorable to the moving party that the jury was not required to believe." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012) (internal quotation marks and citation omitted). Rule 50(b) sets a "high bar" as the prevailing party at trial is given "the benefit of every inference." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019). The Court may disturb the jury's verdict only if no rational jury could have found for the nonmovant. *Id.*

Second, Defendants request that the Court vacate the jury's award of lost wages and pension benefits pursuant to Rule 59(e). A party may succeed on a Rule 59(e) motion "only if there has been a manifest error of fact or law, or if there is newly discovered evidence that was not previously available." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). But a Rule 59(e) motion "is not meant to allow a party to undo errors made in the district court before the judgment." *Id.* (citation omitted). Nor does it permit "a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *A&C Constr. & Installation, Co. WLL v. Zurich Am. Ins. Co.*, 963 F.3d 705, 709 (7th Cir. 2020) (internal quotation marks and citation omitted). In addition, "a Rule 59 motion is not a forum to relitigate losing arguments." *Ohr ex rel. NLRB v. Latino Express, Inc.*, 776 F.3d 469, 478 (7th Cir. 2015).

Third, Defendants seek a new trial pursuant to Rule 59(a). A new trial is warranted "if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Lewis v. McLean*, 941 F.3d 886, 891 (7th Cir. 2019) (internal quotation marks and citation omitted). In other words, "a new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the

record, cries out to be overturned or shocks our conscience." *Estate of Burford v. Acct. Prac. Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017) (internal quotation marks and citation omitted).

## I.      Renewed Request for Judgment as a Matter of Law

Defendants first contend that Weinstein is entitled to judgment as a matter of law as to Higgins's and Deram's claims against her on the basis of the *Elrod-Branti* exception to the First Amendment's protections. Specifically, Defendants argue that no reasonable jury could have found that political loyalty was ***not*** an appropriate requirement for the Department Chief position.

Generally, the First Amendment prohibits government officials from terminating employees based on their political affiliation. *Hanson v. LeVan*, 967 F.3d 584, 588 (7th Cir. 2020). However, the *Elrod-Branti* exception to political patronage dismissals provides that government officials may dismiss a public employee based on political affiliation where "political loyalty is a valid job qualification." *Bogart v. Vermilion County*, 909 F.3d 210, 213 (7th Cir. 2018) (first citing *Branti v. Finkel*, 445 U.S. 507, 516 (1980); then citing *Elrod v. Burns*, 427 U.S. 347, 372 (1976)). "[P]olitical affiliation is an appropriate requirement when the employee's position authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Hanson*, 967 F.3d at 593 (internal quotation marks and citations omitted). This inquiry includes (1) whether the position involves the exercise of a substantial amount of political, rather than professional discretion, and whether (2) the position gives its holder access to the superior's confidential, politically sensitive thoughts. *Id.* A defendant bears the burden of establishing that a plaintiff's position falls within the *Elrod-Branti* exception. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 354 (7th Cir. 2005).

The Seventh Circuit has recognized numerous positions as falling under the *Elrod-Branti* exception, such as a city commissioner of streets and alleys, a senior humane officer for a city board of public safety, an accounting bureau chief for a state transportation department, an elementary school principal, a senior fiscal analyst for a city block grant committee, a subdistrict superintendent for state highway department, a general inspector for local health department, deputy sheriff, and an assistant state's attorney. *Hagan v. Quinn*, 867 F.3d 816, 827 (7th Cir. 2017) (collecting cases). To determine whether the *Elrod-Branti* exception applies to a position, courts focus on "powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Id.* at 825 (citations omitted). With respect to the powers inherent in an office, a party's testimony about how the position is performed is relevant when statutes, ordinances, and job descriptions do not provide a full picture of the position, or when the job description is inaccurate or unreliable. *Hanson*, 967 F.3d at 593.

Since there is no job description for the Department Chief position at issue here, the Court relies on the parties' trial testimony about how the job was performed.[3] Contrary to Defendants' assertions, there was sufficient evidence for a jury to find that the *Elrod-Branti* exception did not apply to Higgins or Deram, particularly as Weinstein bore the burden of proof.

---

[3] Typically, courts must only examine an official job description and analyze how the description was created and how often it was updated to evaluate whether the *Elrod-Branti* exception applies—unless a party shows that the description is unreliable or has been manipulated. *Bogart*, 909 F.3d at 213–14. At the summary judgment stage, the parties disputed whether the Deputy Chief position description applied to Higgins and Deram. Per the job description, the Deputy Chief's responsibilities include developing procedures and protocols. (Defs. Ex. 17 at 5.) Additionally, a requirement for the Deputy Chief position is a bachelor's degree. (*Id.* at 7.) At trial, Higgins and Deram testified that they did not have bachelor's degrees. (Trial Tr. 304:7–8, 430:11–12.) Weinstein also admitted that Higgins and Deram never held the Deputy Chief position, only the Department Chief position. (*Id.* 1367:17–19.) But Weinstein also asserted that Higgins practically carried out the role of the Deputy Chief based on all her responsibilities. (*Id.* 1367:10–14.) Without any evidence that Higgins or Deram held the title of Deputy Chief, this job description has little relevance to the *Elrod-Branti* analysis.

At the Clerk's Office, the Department Chief position was two levels below the Circuit Court Clerk in the office hierarchy, with the Chief Deputy position between the two positions. (Trial Tr. 396:20–397:24.) Higgins testified that as Department Chief she supervised approximately seventy employees, provided input on confidential employee personnel evaluations, balanced the branch courts' financials, and conferred with the judiciary concerning new procedures. (*Id.* 304:12–17, 396:1–2, 399:4–400:5.) Higgins further acknowledged that Brin and Polydoris trusted her judgment regarding personnel recommendations and considered her a "fresh set of eyes" for developing better ways to serve the public in the traffic and branch courts. (*Id.* 396:6–9, 400:8–11.) She also testified that she met with judges regarding the Clerk's Office's new plan for managing the evidence room. (401:24–402:3.) Most significantly, Higgins testified that, while she had input in recommending procedural changes, she never created policy for the Clerk's Office; instead, she carried out the policies Brin and Polydoris created. (*Id.* 304:18–25, 396:10–12, 400:12–401:1.) Moreover, Higgins stated that Brin did not share confidential, political plans with her, and Polydoris did not allow her to meet with Brin alone. (*Id.* 1441:4–20.)

Similarly, Deram testified that she reported directly to Polydoris, who did not permit her to meet with Brin alone, and Brin never shared confidential, political plans with Deram. (*Id.* 1449:7–20.) Deram admitted that Brin and Polydoris trusted her work and her ability to help make difficult decisions. (*Id.* 598:11–13, 615:13–19.) She also testified that as Department Chief she supervised around sixty employees, managed case records, ensured that the Clerk's Office complied with local and state rules, assisted with the development and implementation of the evidence protocol, worked with Brin on the e-filing system, and consulted with the Lake County State's Attorney's Office and AOIC for guidance on issues. (*Id.* 426:25–427:5, 525:3–16, 598:14–21, 605:15–17, 612:9–20, 614:10–19, 1448:10–1449:1.) According to Deram, most Clerk's Office

11

policies were already created by local or state rules; therefore, her research typically involved finding the appropriate local or state rule, presenting the information to Brin and Polydoris, and then modifying the current procedures to conform to the required policies and procedures. (*Id.* 611:12–612:21–24, 614:1–3.)

With respect to the evidence protocol, Deram admitted that judges somewhat blamed the Brin administration for the handling and rollout of the evidence protocol. (*Id.* 610:22–611:8.) Deram testified that she researched information from other circuit court clerk's offices, the AOIC, and Illinois Supreme Court rules for ideas; she then presented that information to Brin and Polydoris. (*Id.* 605:18–606:6.) Brin and Polydoris considered her research. (*Id.* 606:16–23.) But Deram further testified that the Clerk's Office's procedure for handling evidence was not confidential information because the information was usually extracted from AOIC rules or 19th Judicial Circuit rules. (*Id.* 599:17–600:17.) As to the e-filing system, Deram agreed that it was an important issue for the Clerk's Office and an initiative that Brin promoted during his re-election campaign. (*Id.* 614:18–615:8.) Yet she also testified that the Brin administration launched the e-filing system before her tenure as Department Chief, so her role was to ensure that the Clerk's Office followed the administrative rules and statutory requirements for e-filing. (*Id.* 614:10–19, 1448:10–1449:1.)

Although the record contains evidence that Higgins and Deram exercised meaningful discretion in their managerial roles and had input into Brin's decisionmaking for initiatives at the Clerk's Office, a rational jury could have found that Higgins and Deram exercised professional, rather than political, discretion. As noted above, the jury heard testimony that the Clerk and Chief Deputy created policy, that the Department Chiefs did not create policy and instead merely implemented the Clerk and Chief Deputy's policies, and that the Department Chiefs primarily

12

followed the procedures established by local and state rules. Indeed, even Weinstein conceded that Department Chiefs in her administration do not create policy. (*Id.* 915:4–17, 916:13–18.) Accordingly, a reasonable jury could have concluded that the policy decisions at the Clerk's Office were made at levels above Department Chiefs and that Higgins's and Deram's discretion was cabined by their superiors and state and local rules. *Cf. Hanson*, 967 F.3d at 594 (finding that a deputy assessor's use of predetermined formulas and computer programs established by statutes, regulations, guidelines, and superiors "suggest[ed] that any discretion the position holds is channeled by professional rather than political norms.").

Furthermore, a rational jury could have determined that Higgins and Deram did not have access to Brin's confidential, politically sensitive thoughts. For instance, the jury heard evidence that while Brin and Polydoris trusted Higgins's and Deram's judgment, Department Chiefs reported to the Deputy Chief instead of the Clerk, Polydoris prevented Higgins and Deram from meeting with Brin alone, and Brin did not share confidential, politically sensitive plans with Higgins and Deram; moreover, Deram testified that the evidence protocol, which she and Higgins worked on, was not confidential. *Cf. Allman v. Smith*, 6 F. Supp. 3d 889, 902 (S.D. Ind. 2014), *aff'd*, 790 F.3d 762 (7th Cir. 2015) (reasoning that a customer service supervisor at the city's utility department likely fell outside the *Elrod-Branti* exception because she did not report to the head of the department, she primarily interacted with co-workers and the general public rather than high-level city officials, the confidential information to which she had access was not politically sensitive, and she mainly complied with department policies and rules instead of developing such policies).

In advocating for the applicability of the *Elrod-Branti* exception, Defendants rely on Weinstein's testimony that Department Chiefs in her administration have meaningful input into

13

her decisionmaking as Clerk, that Department Chiefs work on policy with her, and that Department Chiefs bring issues involving the Clerk's Office directly to her. (Trial Tr. 915:25–916:2, 916:13–18, 1304:2–9, 1368:14–22.) However, the jury was not required to credit Weinstein's testimony. *See Passananti*, 689 F.3d at 659. And the Court cannot make credibility determinations or weigh the evidence when considering a Rule 50(b) motion. *Id.*

In short, the Court cannot conclude that the jury lacked a sufficient evidentiary basis from which to find in favor of Higgins and Deram on the *Elrod-Branti* issue. Therefore, Defendants' request for judgment as a matter of law is denied.

## II.     Request to Alter or Amend Judgment

### A.     Award of Lost Wages and Benefits

Turning to damages, Defendants request that the Court vacate the jury's award of lost wages and the present value of lost pension benefits.

#### 1.     *Availability of Lost Wages and Benefits Against Weinstein*

First, Defendants argue that the jury's award of lost wages and the present value of lost pension benefits must be vacated because those remedies are unavailable against Weinstein in her individual capacity. Relatedly, Defendants also contend that the Eleventh Amendment bars this relief because an award of lost wages and pension benefits is paid by an employer, thereby improperly compelling state action.[4]

---

[4] This is the first time in briefing that Defendants have argued that lost wages and pension benefits cannot be awarded against Weinstein in her individual capacity or that the Eleventh Amendment bars those remedies. Defendants previously argued in a motion *in limine* that backpay and pension benefits were equitable remedies, not legal relief appropriate for jury consideration. The Court acknowledges, however, that at the final pretrial conference, Weinstein briefly posited that equitable remedies such as back pay, front pay, and reinstatement could not be obtained against her in her individual capacity. Normally, a party cannot use a Rule 59(e) motion to advance arguments that should have been raised prior to final judgment. *A&C Constr.*, 963 F.3d at 709. But the Eleventh Amendment limits the federal courts' jurisdiction. *McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 532 (7th Cir. 2022). Accordingly, Eleventh Amendment immunity can be raised at any time. *Id.*

14

State actor defendants sued in their individual capacities do not possess the power to pay a plaintiff's backpay award. *Lenea v. Lane*, 882 F.2d 1171, 1178 (7th Cir. 1989) ("If these sums should have been paid, they should have been paid by the State, not by the defendants in their individual capacities."); *see also Maduko v. Illinois*, No. 07 C 4701, 2008 WL 4279982, at *2 n.3 (N.D. Ill. Sept. 17, 2008) (noting that the plaintiff's requested relief in the form of back pay and benefits were unavailable remedies against his supervisor acting in his individual capacity). Here, the parties dispute whether the jury awarded Plaintiffs backpay, in the form of back wages and lost pension benefits, or legal compensatory damages, in the form of lost wages and lost benefits.

The Court previously granted in part and denied in part Defendants' motion *in limine* to exclude any reference to and evidence of Plaintiffs' requested equitable remedies before the jury. (11/17/2022 Order at 1, Dkt. No. 199.) Specifically, the Court granted Defendants' request that Plaintiffs be barred from presenting to the jury evidence of their requested relief in the form of reinstatement, but denied Defendants' request that Plaintiffs be prohibited from introducing evidence of their requested remedies in the form of back pay, front pay, future pecuniary losses, and lost benefits. (*Id.*) The Court concluded that, while reinstatement is an equitable remedy reserved for the Court's determination, Plaintiffs' requests for back pay, front pay, and lost benefits were appropriately considered by the jury as compensatory damages in this § 1983 action because those damages are analogous to awards of past and future lost wages and benefits in common-law tort suits, § 1983's statutory language does not characterize those remedies as equitable relief or restrict what juries may consider as part of their compensatory damages award, and Plaintiffs were essentially seeking monetary relief from Weinstein in her individual capacity. (*Id.* at 4.)

As a result, the Court used a modified version of Seventh Circuit Pattern Civil Jury Instruction § 7.26 for compensatory damages in § 1983 actions, as opposed to Seventh Circuit Pattern Civil Jury Instruction § 3.11 for backpay in employment discrimination cases.[5] The Court's jury instructions thus provided that the jury should consider the following types of compensatory damages: (1) "physical and mental and emotional pain and suffering that Plaintiff has experienced;" (2) "wages and salary that Plaintiff has lost minus the wages and salary that Plaintiff received from other employment during that time (i.e., back pay);" (3) "present value of wages and salary that Plaintiff is reasonably certain to lose in the future minus the wages and salary that Plaintiff will likely receive in the future from other employment (i.e., front pay);" and (4) "present value of the benefits that Plaintiff has lost." (Jury Instructions at 24.)

Despite the Court using the term "backpay" as a parenthetical shorthand in the jury instructions and verdict form, the substance of the instruction was for the jury to award money damages to compensate Plaintiff for net lost wages. The Court now makes explicit what was implicit in its motion *in limine* ruling: the Court views Plaintiffs' claim for backpay and lost benefits against Weinstein in her individual capacity in this § 1983 action as a request for money damages in the form of lost wages and lost benefits. Thus, the jury's compensatory damages award is more properly considered as an award of net lost wages and benefits, rather than backpay. *See Sakelaris v. Danikolas*, No. 2:05-CV-158, 2007 WL 1832119, at *2 (N.D. Ind. June 22, 2007) (agreeing that individual capacity defendants lack the power to pay back wages but construing the plaintiff's claim against a state official as a claim for money damages against the defendants in their individual capacities); *Benton v. Robinson*, No. 85 C 10324, 1990 WL 251745,

---

[5] At the charge conference, Weinstein did not challenge the use of the compensatory damages instruction instead of the backpay instruction.

at *6–7 (N.D. Ill. Dec. 21, 1990) (same); *see also Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306–307 (1986) (noting that compensatory damages in § 1983 cases may include out-of-pocket losses and other monetary harms). Accordingly, lost wages and benefits are appropriate compensatory damages against Weinstein in her individual capacity. *Cf. Negron-Almeda v. Santiago,* 528 F.3d 15, 26–27 (1st Cir. 2008) (noting the settled law in federal courts that backpay cannot be awarded against a defendant in his individual capacity, but a plaintiff's compensatory damages award against an individual capacity defendant may include plaintiff's net lost wages and benefits).

Defendants cite *Lenea v. Lane* for the proposition that regardless of whether a plaintiff characterizes her request for personal monetary relief as equitable or legal damages, an individual capacity defendant lacks the power to pay back wages. In *Lenea*, the Seventh Circuit concluded that a prisoner's claim for backpay against state prison officials sued in their individual capacities for loss of his chapel job was "really one for a retroactive award of monetary relief which requires the payment of funds from the state's treasury;" thus, the Eleventh Amendment foreclosed an award of backpay. 882 F.2d at 1176, 1178. That said, the Seventh Circuit went on to find that the "backpay" the plaintiff sought from the individual defendants was "in the nature of damages," regardless of how the plaintiff styled his request; in other words, the plaintiff sought a "personal monetary award out of the official's own pocket." *Id.* at 1178–79. The officials' qualified immunity, however, barred any such damages award. *Id.* at 1179. Here, by contrast, Weinstein has not argued that qualified immunity prohibits a money damages award against her in her individual capacity. As such, *Lenea* does not aid Defendants' argument.

Moving to Defendants' sovereign immunity argument, the Eleventh Amendment "bars actions in federal court against a state, state agencies, or state officials acting in their official

capacities." *Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010). But the Eleventh Amendment does not generally prohibit suits against state officials in their individual capacities because the plaintiff seeks damages from those individuals' personal assets, not the state treasury. *Luder v. Endicott*, 253 F.3d 1020, 1022–23 (7th Cir. 2001). Nevertheless, a plaintiff cannot obtain "monetary relief from state employees in their ***individual*** capacities ***if*** the suit demonstrably has the identical effect as a suit against the state." *Haynes v. Indiana Univ.*, 902 F.3d 724, 732 (7th Cir. 2018) (internal quotation marks and citation omitted). In essence, a suit is against the state "if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Luder*, 253 F.3d at 1023 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n. 11 (1984)); *see also Loizon v. Evans*, No. 18 C 2759, 2020 WL 5253852, at *8 (N.D. Ill. Sept. 3, 2020) (noting that public employees cannot seek backpay or reinstatement from individual defendants as those remedies require state action to implement). Even so, a state's decision to indemnify its employees for federal court judgments against them is insufficient for Eleventh Amendment purposes to make it a suit against the state. *Luder*, 253 F.3d at 1023 ("Indirect effects are not enough; otherwise the practical necessity for a state to compensate an employee for bearing liability risks would place individual-capacity suits under the bar of the Eleventh Amendment.").

Here, Defendants have offered no persuasive reason for the Court to find that a judgment against Weinstein in her individual capacity for lost wages and benefits would expend itself on the state treasury, interfere with public administration, or compel the state to act. *Cf. Loizon*, 2020 WL 5253852, at *8 (refusing to dismiss a plaintiff's § 1983 claim against a state court judge in his individual capacity on sovereign immunity grounds while dismissing the plaintiff's request for

reinstatement). The jury awarded Plaintiffs compensatory damages in the amounts of their lost wages and benefits against Weinstein personally, rather than backpay, so the state would not be compelled to act as an employer. That the state might indemnify Weinstein for the judgment against her is an irrelevant, indirect effect. Accordingly, the Eleventh Amendment does not bar the jury's award of lost wages and pension benefits.

### 2. Appropriateness of Lay Testimony as to Lost Wages and Benefits

Defendants further assert that the jury's award of lost wages and the present value of pension benefits must be vacated because the Court erroneously permitted Plaintiffs to testify as to the present value of their lost pension benefits, despite such calculations requiring specialized knowledge. Put differently, Defendants complain that Plaintiffs relied on lay testimony rather than expert testimony to support their present value calculations.

"Lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *United States v. Christian*, 673 F.3d 702, 709 (7th Cir. 2012). Additionally, lay testimony must not be "based on scientific, technical, or other specialized knowledge within the scope of [Federal] Rule [of Evidence] 702" for expert testimony. Fed. R. Evid. 701. Here, Defendants point to no Seventh Circuit authority requiring expert testimony for the sort of basic present value calculation presented by Plaintiffs in this case. And the Court sees no reason why such testimony should have been required.

Notably, the underlying information regarding the value of Plaintiffs' pension benefits came directly from IMRF documents admitted into evidence. Defendants do not challenge the admission of those documents or contest the amounts stated therein. However, the IMRF documents did not include calculations of the present value of the pension benefits. For those

calculations, Deram and Smothers plugged the uncontested information from the IMRF documentation into a standard formula obtained from publicly available websites and government sources. Defendants do not claim that the formula used by Deram and Smothers was incorrect. Nor do they suggest that an "expert" would have used a different formula or proposed an alternative approach. Indeed, the straightforward calculation performed by Derman and Smothers is consistent with the method of calculating present value regularly utilized in this Circuit and elsewhere. While certainly not as simple as one plus one equals two, the basic present value calculation performed by Deram and Smothers is fairly described as the sort of "reasoning familiar in everyday life" to which a lay person may testify.[6]

Defendants further argue that Plaintiffs' testimony about lost wages and pension benefits were offered without reliable factual foundation. In particular, Defendants assert that the IMRF records incorrectly assume that Plaintiffs would have continued earning their same salary if they had kept their positions at the Clerk's Office. They point to the fact that the IMRF did not contact the Clerk's Office to determine the salary for Plaintiffs' positions following their terminations. Defendants also cite Weinstein's testimony, where she stated that she significantly reduced the salary of the Department Chief position to employ a third Department Chief.

But Defendants offer no authority suggesting that the jury was required to credit Weinstein's explanation. Nor do Defendants point to any authority stating that a party's lost wages calculation must incorporate the salary of that party's replacement to be an accurate assumption. Further, the jury could have found that Weinstein's decision to reduce the salary of

---

[6] Defendants concerns about Deram's and Smothers's present value analyses do not apply to Higgins. She did not perform such a calculation because she had already reached the age of 55 in 2021; instead, she used basic arithmetic to subtract her hypothetical pension value at age 55 from her actual pension value at age 55. Both of those values were provided to Higgins by the IMRF's pension administration system.

the Department Chief position was related to her decision to unlawfully terminate Higgins and Deram. Similarly, in *Hall v. Sterling Park District*, No. 08 C 50116, 2012 WL 1050302, at *3 (N.D. Ill. Mar. 28, 2012), the court rejected the defendant's argument in a motion *in limine* that the plaintiff's IMRF pension benefit calculations were erroneous just because the defendant eliminated the plaintiff's position and replaced it with a lower-salaried position following his termination. Specifically, the court reasoned that the plaintiff's theory of IMRF damages was "inextricably linked" to his claim that the defendant unlawfully terminated him; as such, the parties' competing theories of damages would be appropriately decided at trial, where the defendant could challenge the plaintiff's evidence and assumptions. *Id.* The same may be said here. In short, the Court finds no reason to vacate Deram's and Smothers's award of present value of lost pension benefits.

### B.    Injunctive Relief Against Clerk's Office

Defendants next request that the Court amend the judgment to dismiss Plaintiffs' claims for injunctive relief against the Clerk's Office because Higgins and Deram no longer seek reinstatement or front pay and the jury did not award Smothers front pay. Plaintiffs agree that their claims for injunctive relief against the Clerk's Office should be dismissed because Plaintiffs no longer seek reinstatement. Accordingly, the Court dismisses Plaintiffs' remaining claims against the Clerk's Office. The judgment will be amended to reflect the dismissal.

### III.    Request for New Trial

Finally, Defendants move for a new trial on the grounds that a purported error during the jury selection process improperly gave Plaintiffs a strategic advantage and fundamentally tainted the fairness of the trial. More specifically, Defendants argue that the Court erred in denying two of Weinstein's challenges for cause, thereby forcing Weinstein to exercise her peremptory

21

challenges to eliminate two jurors who were biased against elected officials (Jurors No. 16 and

Juror No. 20). They also contend that the Court granted Plaintiffs' challenge for cause for a

similarly situated juror (presumably Juror No. 21, based on Defendants' citation to the trial

transcript).

When considering a decision not to dismiss a juror, the Court focuses "on the impartiality

of the jury that actually sat." *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012). At bottom, a

party's right to an impartial jury is not violated where a court fails to remove a biased juror for

cause and that party is consequently forced to use a peremptory strike to remove the juror. *See*

*United States v. Martinez-Salazar*, 528 U.S. 304, 317 (2000) ("[A] defendant's exercise of

peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant

chooses to use a peremptory challenge to remove a juror who should have been excused for

cause"); *United States v. Brodnicki*, 516 F.3d 570, 575 (7th Cir. 2008) (finding that a party was

not deprived of a constitutional or rule-based right, where the party was able to use his

peremptory strikes to exclude allegedly biased jurors). Here, Weinstein used her peremptory

strikes to remove Juror No. 16 and Juror No. 20. (Trial Tr. 238:4–5.) Even assuming *arguendo*

that those jurors were biased, those jurors never sat on the jury. Consequently, Weinstein's right

to an impartial jury was not impaired so as to warrant a new trial.

Defendants rely on *Jimenez v. City of Chicago*, 732 F.3d 710, 716 (7th Cir. 2013), for the

proposition that the Seventh Circuit has left open the door for an exceptionally confused jury-

selection process to warrant a new trial even if the seated jury was impartial. According to

*Jimenez*, an example of such an exceptionally confused jury-selection process occurred when a

district judge allowed the prosecution to exercise a remaining peremptory challenge in the middle

of the trial, thereby unfairly giving one side "unilateral, discretionary control over the composition

of the jury mid-trial." 732 F.3d at 714, 716 (quoting *United States v. Harbin*, 250 F.3d 532, 547 (7th Cir. 2001)) (rejecting the defendants' claims that there was an exceptionally confused jury-selection process and that the plaintiff had a strategic advantage, even assuming that the district court erred in granting the plaintiff's *Batson* challenge and denying the defendants an additional peremptory strike). In this case, however, the Court used a standard and straightforward jury selection process, allowing the parties each to exercise their challenges for cause and peremptory strikes at the same time as the other side. Thus, the narrow exception for an exceptionally confused jury-selection process is inapplicable here.

Furthermore, the Court would still deny Defendants' request for a new trial even if Juror No. 16 and Juror No. 20 sat on the jury. It is well-settled that "[w]hen a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, [the Court] can have no confidence that the juror will 'lay aside' her biases or her prejudicial personal experiences and render a fair and impartial verdict." *Thompson v. Altheimer & Gray*, 248 F.3d 621, 627 (7th Cir. 2001) (citation omitted) (concluding that the lower court erred in refusing to dismiss a juror for cause, where the juror said that she would try to be fair but expressed no confidence in her ability to be fair). But such circumstances were not present here.

As to Juror No. 16, she expressed initial concerns about people using positions of power to be unjust and penalize others for their political beliefs. (Trial Tr. 85:13–16, 86:8–13.) When the Court asked whether she would be able to keep an open mind about who to believe until she heard all of the evidence, Juror No. 16 initially stated that she was unsure, but she could try to do so. (*Id.* 85:17–86:13.) That said, she confirmed that she would follow the court's instructions on the law even if she personally disagreed with those instructions and that she would consider whether the plaintiffs proved their claims by a preponderance of the evidence solely based on the evidence and

23

the Court's instructions on the law. (*Id.* 86:18–20, 87:6–88:6.) Despite Defendants' protestations

to the contrary, that Juror No. 16 answered "yes, I think so" does not make her answer equivocal.

Nonetheless, the Court called Juror No. 16 back for additional questioning to better

understand her hesitation. (*Id.* 95:16–96:11.) Upon further questioning, Juror No. 16 confirmed

that there was no reason she would be unable to start the case from a fair and impartial position

and decide the case based on the evidence. (*Id.* 114:25–115:11.) Significantly, she responded "no"

when asked if it mattered what political party Plaintiffs or Weinstein supported. (*Id.* 115:12–16.)

Therefore, the Court concludes that it did not err in denying Weinstein's challenge for cause. *Cf.*

*Griffin*, 694 F.3d at 826 (holding that the court did not abuse its discretion in declining to strike a

juror for cause because the juror indicated that she would keep an open mind and not make a

decision until she heard all of the evidence, despite the juror previously stating that she would find

a police officer more credible than a young witness).

As to Juror No. 20, she indicated that she had prior history as a victim of workplace

retaliation. (Trial Tr. 135:7–136:6.) She also believed that "supervisors have pen power," based

on her experience. (*Id.* 136:7–12.) When asked whether she would keep an open mind in deciding

which party to believe, Juror No. 20 stated that she would try, but she did not know if she would

be successful. (*Id.* 136:13–20.) Like Juror No. 16, she confirmed that she would follow the

Court's instruction on the law even if she personally disagreed with the instructions. (*Id.* 137:20–

23.) And she said that she would be able to find in favor of the defendant if the plaintiffs failed to

offer sufficient evidence to support their claims. (*Id.* 137:21–25.)

As with Juror No. 16, the Court held Juror No. 20 back for additional questioning. (*Id.*

182:5–16.) Upon further questioning, Juror No. 20 stated that she would lean more toward

believing the person with less power, yet she would try to keep a fair and open mind until the end

of the evidence. (*Id.* 189:8–190:1.) The Court then asked Juror No. 20 what was preventing her from keeping an open mind; she responded that she loved her job, so it would be difficult to focus on the trial due to her busy work schedule. (*Id.*190:3–23.) She confirmed that her true concern was her work obligations, rather than a concern about favoring one party. (*Id.* 190:24–191:3.) While perhaps a closer call than Juror No. 16, the Court finds no error in refusing to excuse Juror No. 20 for cause because she indicated that she would follow the Court's instruction on the law and she would find in the defendant's favor if the plaintiffs failed to prove their case. Moreover, she later confirmed that her real concern was her work obligations, not a problem with being fair.

For these reasons, the Court denies Defendants' motion for a new trial.

## CONCLUSION

For the reasons discussed above, Defendants' post-trial motion (Dkt. No. 222) is granted in part and denied in part. The motion is granted with respect to Defendants' request to amend the judgment to reflect the dismissal of Plaintiffs' claims for injunctive relief against the Clerk's Office. The motion is otherwise denied.

ENTERED:

Dated: December 18, 2025

Andrea R. Wood
United States District Judge